**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| YOUNG AMERICA'S FOUNDATION,<br>a nonprofit corporation,<br><br>*Plaintiff*,<br><br>v.<br><br>INTERNAL REVENUE SERVICE; UNITED STATES DEPARTMENT OF THE TREASURY; SCOTT BESSENT, in his official capacity as Secretary of the Treasury; and FRANK J. BISIGNANO in his official capacity as CEO of the Internal Revenue Service,<br><br>*Defendants*. | Case No. 1:26-cv-02449-TNM |

**PLAINTIFF'S OPPOSITION TO THE MOTION TO DISMISS**

Tyler Martinez (Atty. No. 1022937)
Joseph Henchman (Atty. No. 985625)
NATIONAL TAXPAYERS UNION FOUNDATION
122 C Street N.W., Suite 700
Washington, D.C. 20001
Telephone: (703) 683-5700
tmartinez@ntu.org
jbh@ntu.org

*Counsel for Plaintiff*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to LCvR 26.1 and this Court's Standing Order ¶ 4, counsel for Plaintiff certifies that Young America's Foundation ("YAF") is a nonprofit, tax-exempt organization under Internal Revenue Code §501(c)(3) and is incorporated in Tennessee with its principal place of business in Virginia. YAF has no parent companies, subsidiaries, or affiliates that have issued shares to the public.

s/ Tyler Martinez
Tyler Martinez

Dated: October 28, 2026

*Counsel for Plaintiff*

## TABLE OF CONTENTS


CORPORATE DISCLOSURE STATEMENT .......... i

TABLE OF CONTENTS .......... ii

TABLE OF AUTHORITIES .......... iv

OPPOSITION TO THE MOTION TO DISMISS .......... 1

STATEMENT OF THE CASE .......... 1

I. YOUNG AMERICA'S FOUNDATION .......... 1

II. THE LEGAL FRAMEWORK OF DONOR DISCLOSURE TO THE IRS .......... 2

III. THE DISCLOSURE OF YOUNG AMERICA'S FOUNDATION'S INFORMATION .......... 4

STANDARD OF REVIEW .......... 7

SUMMARY OF THE ARGUMENT .......... 7

ARGUMENT .......... 10

I. DRAGNET DONOR DATA COLLECTION BY THE IRS IS SUBJECT TO THE FIRST AMENDMENT'S EXACTING SCRUTINY. .......... 10

II. THE DRAGNET DONOR LIST DEMANDS OF THE IRS CANNOT SURVIVE EXACTING SCRUTINTY. .......... 15

A. The Regular and Universal Collection of Donor Data on Schedule B is Not Necessary to Enforce the Tax Laws. .......... 15

1. All Publicly Available Information Suggest that the IRS is Not Using the Donor Data it Collects. .......... 17

2. The Remaining Asserted Interests are not "Sufficiently Important." .......... 21

B. The IRS Donor List Demands Fail Exacting Scrutiny's Tailoring Analysis .......... 22

C. The IRS Cannot Keep the Donor Data Secure and the Government is not Vigilant in Correcting Data Breaches. .......... 25

III. RATIONAL BASIS REVIEW DOES NOT COMPEL DISMISSAL AND SCHEDULE B CANNOT SURVIVE THIS MINIMAL REVIEW ANYWAY. .......... 30

CONCLUSION .......... 39

REQUEST FOR ORAL ARGUMENT .................................................................................... 39

## TABLE OF AUTHORITIES

### Cases

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) ........ 32, 35, 37

**Americans for Prosperity Foundation v. Bonta*,
594 U.S. 595 (2021) ........ 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 21, 25, 30, 32, 34

*Ark. Writers' Project, Inc. v. Ragland*,
481 U.S. 221 (1987) ........ 34, 35

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 7

*Bates v. City of Little Rock*,
361 U.S. 516 (1960) ........ 10, 14, 22

*Berk v. Choy*,
607 U.S. 187 (2026) ........ 7

*Buckeye Inst. v. IRS*,
No. 2:22-CV-4297, 2023 WL 7412043 (S.D. Ohio Nov. 9, 2023) ........ 13

*Buckley v. Valeo*,
424 U.S. 1 (1976) ........ 10, 11, 14, 22

*City of Cleburne, Tex. v. Cleburne Living Center.*,
473 U.S. 432, 446 (1985) ........ 31

*De Csepel v. Republic of Hungary*,
714 F.3d 591 (D.C. Cir. 2013) ........ 7, 17

*Fed. Election Comm'n v. Cruz*,
596 U.S. 289 (2022) ........ 16, 21

*Fed. Election Comm'n v. Wis. Right to Life, Inc.*,
551 U.S. 449 (2007) ........ 22

**First Choice Women's Resource Centers, Inc. v. Davenport*,
608 U.S. 174 (2026) ........ 8, 9, 10, 11, 15, 30, 34

*Gibson v. Florida Legislative Investigative Comm.*,
372 U.S. 539 (1963) ........ 10, 11

*Gooding v. Wilson*,
405 U.S. 518 (1972) ........ 22

In re *Primus*,
436 U.S. 412 (1978) ........ 22

*Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*,
385 U.S. 589 (1967) ........ 22

*Kusper v. Pontikes*,
414 U.S. 51 (1973) ........ 11

*Legal Services Corporation v. Velazquez*,
531 U.S. 533 (2001) ........ 37

*Lewis Publishing Co. v. Morgan*,
229 U.S. 288 (1913) ........ 33, 34

*Mahmoud v. Taylor*,
606 U.S. 522 (2025) ........ 33

*Marks v. United States*,
430 U.S. 188 (1977) ........ 12

*McCutcheon v. Fed. Election Comm'n*,
572 U.S. 185, 210 (2014) ........ 16, 23

*Minnesota Voters Alliance v. Mansky*,
585 U.S. 1 (2018) ........ 31

*Mobile Republican Assembly v. United States*,
353 F.3d 1357 (11th Cir. 2003) ........ 35

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ........ 32

**NAACP v. Ala. ex rel. Patterson*,
357 U.S. 449 (1958) ........ 10, 11, 14

*NAACP v. Button*,
371 U.S. 415 (1963) ........ 10, 14, 22

*Nat'l Small Bus. United v. U.S. Dep't of the Treas*,
161 F.4th 1323 (11th Cir. 2025) ........ 34

*Nixon v. Shrink Mo. Gov't PAC*,
528 U.S. 377 (2000) ........ 21

*Perry v. Sindermann*,
408 U.S. 593 (1972) ........ 32

*Regan v. Taxation With Representation of Washington*,
461 U.S. 540 (1983) .......... 13, 33, 36

*Roberts v. United States Jaycees*,
468 U.S. 609 (1984) .......... 10

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*,
547 U.S. 47 (2006) .......... 32

*Rust v. Sullivan*,
500 U.S. 173 (1991) .......... 33, 36

*Secretary of State of Md. v. Joseph H. Munson Co.*,
467 U.S. 947 (1984) .......... 12

*Shelton v. Tucker*,
364 U.S. 479 (1960) .......... 10, 11, 14

*St. Joseph Abbey v. Castille*,
712 F.3d 215 (5th Cir. 2013) .......... 31

*Talley v. Cal.*,
362 U.S. 60 (1960) .......... 10

*U.S. Department of Agriculture v. Moreno*,
413 U.S. 528 (1973) .......... 31

*United States v. American Library Association, Inc.*,
539 U.S. 194 (2003) .......... 36

*United States v. Nat'l Treasury Emps. Union*,
513 U.S. 454 (1995) .......... 16

*United States v. Stevens*,
559 U.S. 460 (2010) .......... 32

*Village of Schaumburg v. Citizens for a Better Environment*,
444 U.S. 620 (1980) .......... 13

*Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*,
536 U.S. 150 (2002) .......... 22

*Williams-Yulee v. Fla. Bar*,
575 U.S. 433 (2015) .......... 31

*Wis. Right to Life, Inc. v. Barland*,
751 F.3d 804 (7th Cir. 2014) .......... 22

**Statutes**

26 U.S.C. § 170 ..... 37

26 U.S.C. § 170(b) ..... 2

26 U.S.C. § 170(b)(1)(A)(vi) ..... 3, 20

26 U.S.C. § 501(c) ..... 2, 17, 18

26 U.S.C. § 501(c)(3) ..... 1, 2, 3, 8, 9, 10, 21, 36, 37, 38

26 U.S.C. § 501(c)(4) ..... 17, 38

26 U.S.C. § 501(c)(7) ..... 17

26 U.S.C. § 501(c)(8) ..... 17

26 U.S.C. § 501(c)(10) ..... 18

26 U.S.C. § 507(d)(2) ..... 4, 20

26 U.S.C. § 507(d)(2)(A) ..... 4

26 U.S.C. § 6033 ..... 2

26 U.S.C. § 6033(b) ..... 3

26 U.S.C. § 6033(b)(5) ..... 1, 2, 7, 9, 20, 36, 38

26 U.S.C. § 6104(d)(3)(A) ..... 4

26 U.S.C. § 6652(c)(1) ..... 4

26 U.S.C. § 6652(c)(1)(A) ..... 4

26 U.S.C. § 6652(c)(1)(B)(ii) ..... 4

26 U.S.C. § 6652(c)(7) ..... 4

32 VT. STAT. § 9743 ..... 37

ARIZ. REV. STAT. § 42-11124 ..... 37

ARIZ. REV. STAT. § 43-1041(I)(2) ..... 37

ARIZ. REV. STAT. § 43-1088(K)(1) ..... 37

FLA. STAT. § 252.3712 ..... 38

GA. CODE. § 48-8-3 ........ 37

IDAHO CODE § 63-3022(j)(2) ........ 37

IOWA CODE § 422.7 ........ 37

KAN. STAT. § 79-32,120(a)(5) ........ 37

MD. CODE, TAX–GEN. § 7-203 ........ 38

ME. REV STAT. tit. 36 § 1864 ........ 37

ME. REV. STAT. tit. 36, § 1760(115) ........ 37

MINN. STAT. § 272.02, subd. 7 ........ 37

MONT. CODE § 15-6-201(1)(i) ........ 37

S.C. CODE § 12-6-1130(12) ........ 37

TENN. CODE § 3-17-102 ........ 38

TEX GOV'T CODE § 659.131 ........ 38

UT. CODE ANN. § 59-12-104.1 ........ 37

VA. CODE § 58.1-322.03 ........ 37

WIS. STAT. § 77.54(9a)(f) ........ 37

**Regulations**

26 C.F.R. § 1.6033-2(a)(1) ........ 2

26 C.F.R. § 1.6033-2(a)(2)(i) ........ 3

26 C.F.R. § 1.6033-2(a)(2)(ii) ........ 3

26 C.F.R. § 1.6033-2(a)(2)(ii)(F) ........ 3, 4, 20

26 C.F.R. § 1.6033-2(a)(2)(iii)(A) ........ 3, 20

26 C.F.R. § 1.6033-2(a)(2)(iii)(C) ........ 4

FLA. ADMIN. CODE r. 27PER24-1 ........ 38

**Rules**

Fed. R. Civ. P. 12(b)(6) ........ 1, 7, 9, 31

**Other Authorities**


"US Treasury says Chinese hackers stole documents in 'major incident,'" REUTERS (December 31, 2024) .......... 5

Ali Sullivan, "IRS Worker Gets 5 Years For Airing Tax Info On Trump, Others" LAW360 TAX AUTHORITY (Jan. 29, 2024) .......... 6, 27

Anna Scott Farrell, "Gov't Shrugs Off Sentencing Errors, IRS Leaker Tells DC Circ." LAW360 TAX AUTHORITY (Aug. 21, 2025) .......... 5, 27

Chris Frates, "IRS believes massive data theft originated in Russia," CNN (June 4, 2015) .......... 28

IRS "Returns of Organization Exempt from Income Tax." IRS, About Form 990, Return of Organization Exempt from Income Tax .......... 3

IRS, "Instructions for Schedule L (Form 990) (12/2024)" .......... 24

IRS, "Schedule B (Form 990, 990-EZ, 990-PF), Schedule of Contributors" .......... 3

IRS, CHARITABLE CONTRIBUTIONS: SUBSTANTIATION AND DISCLOSURE REQUIREMENTS 3 Pub. 1771 (Rev. 11-2023) .......... 21

IRS, DATA BOOK, 2024 Pub. No. 55-B (May 2025) .......... 18

IRS, DATA BOOK, 2025 Pub. No. 55-B (May 2025) .......... 18

IRS, Guidance Under Section 6033 Regarding the Reporting Requirements of Exempt Organizations, 85 FED. REG. 31959 (May 28, 2020) .......... 17, 18, 23

IRS, Rev. Proc. 2025-32, 2025-45 I.R.B. 695 (2025) .......... 4

IRS, TAX-EXEMPT STATUS FOR YOUR ORGANIZATION, Pub. 557 (Rev. Jan. 2025) .......... 20

NAT'L TAXPAYER ADVOCATE, ANNUAL REPORT TO CONGRESS 2024 (Dec. 31, 2024) .......... 19

NAT'L TAXPAYER ADVOCATE, ANNUAL REPORT TO CONGRESS 2025 (Jan. 28, 2026) .......... 19

National Archives, *Milestone Documents: 16th Amendment to the U.S. Constitution: Federal Income Tax (1913)* .......... 34

NPR, "Ex-IRS contractor sentenced to 5 years in prison for leaking Trump's tax returns," (Jan. 30, 2024) .......... 6, 26, 27

Raphael Satter and A.J. Vicens, "US Treasury says Chinese hackers stole documents in 'major incident,'"
REUTERS (December 31, 2024) .......... 28

Roger Colinvaux, *Associational Rights Versus Nonprofit Transparency: Information Reporting in the Internet Age*,
2025 U. ILL. L. REV. 1353 (2025) .......... 19

TREAS. INSP. GEN. FOR TAX ADMIN., MAJOR MANAGEMENT CHALLENGES FACING THE IRS IN FISCAL YEAR 2027 (Oct. 2026) .......... 5, 29, 30

TREAS. INSP. GEN. FOR TAX ADMIN., No. 2024-IE-R008, ASSESSMENT OF PROCESSES TO GRANT ACCESS TO SENSITIVE SYSTEMS AND TO SAFEGUARD FEDERAL TAX INFORMATION (Feb. 6, 2024) .......... 30

TREAS. INSP. GEN. FOR TAX ADMIN., Rep. No. 2025-IE-R019, THOUSANDS OF NOTIFICATIONS TO TAXPAYERS AFFECTED BY THE LARGE-SCALE DATA BREACH WERE RETURNED UNDELIVERABLE (May 27, 2025) .......... 5, 26, 27

TREAS. INSP. GEN. FOR TAX ADMIN., Rep. No. 2026-20-053, THE IRS'S CYBERSECURITY PROGRAM WAS NOT EFFECTIVE FOR FISCAL YEAR 2026 (Sept. 15, 2026) .......... 29

U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-21-178T, INFORMATION TECHNOLOGY: IRS NEEDS TO ADDRESS OPERATIONAL CHALLENGES AND OPPORTUNITIES TO IMPROVE MANAGEMENT (Oct. 7, 2020) .......... 5, 28

U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-25-107202, FINANCIAL AUDIT: IRS'S FY 2024 AND FY 2023 FINANCIAL STATEMENTS (Nov. 7, 2024) .......... 29

U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-25-107930, IRS FINANCIAL REPORTING: IMPROVEMENTS NEEDED IN INFORMATION SYSTEM AND OTHER CONTROLS (Mar. 18, 2025) .......... 28, 29

U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-25-108066, PRIORITY OPEN RECOMMENDATIONS: INTERNAL REVENUE SERVICE (Sept. 26, 2025) .......... 28, 29

## OPPOSITION TO THE MOTION TO DISMISS

This Court should deny Defendants' Motion to Dismiss (Dkt. No. 18) under Federal Rule of Civil Procedure 12(b)(6). Nothing in the Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss (Dkt. No. 18-2) ("Defendants' Brief") compel ending the case brought by Plaintiff Young America's Foundation ("YAF") before it starts. The unanimous Supreme Court, as recently as just five months ago, reaffirmed its decades-long requirement for exacting scrutiny for any demands of a donor or membership list of a nonprofit. The Defendants cannot meet this test. Yet they ask this Court to apply an incorrect standard of judicial scrutiny, arguing for rational basis review. This Court should decline that offer to apply the wrong standard and instead allow YAF and the government to present the relevant claims and defenses.

## STATEMENT OF THE CASE

Every year, thousands of nonprofit organizations are compelled to hand over the names, addresses, and donation information of tens of thousands of Americans to the Internal Revenue Service (IRS). This disclosure is required of some (and only some) organizations exempt from taxation under 26 U.S.C. § 501(c)(3) as part of Form 990 Schedule B, the "Schedule of Contributors" required by 26 U.S.C. § 6033(b)(5). In addition to addresses and financial information, these disclosures reveal a plethora of information about individual associations and political, religious, and cultural beliefs. In a time of high political polarization and tension, publicization of this information exposes citizens to retaliation and threats of violence for their association.

### I. YOUNG AMERICA'S FOUNDATION

Plaintiff Young America's Foundation ("YAF") has a mission to educate and inspire young Americans with the ideas of individual liberty, free enterprise, a strong national defense, and traditional values. Verified Compl. ¶ 4. YAF has helped thousands of students protect their First

Amendment rights on campus through education, activism, and legal initiatives across the country. *See id.* Without YAF, many conservative voices would have been banished from the marketplace of ideas to the detriment of American students who should be seeking to challenge and broaden their perspectives. Verified Compl. ¶ 37. YAF is the quintessential educational nonprofit, providing skills, policy instruction, and other educational materials to those whom it serves.

Like any other educational nonprofit, YAF relies on financial and other support from individuals, corporations, and foundations that share its ideological views. Verified Compl. ¶ 37. Given the "hot button" nature of YAF's activities, many of YAF's members and supporters prefer anonymity lest they face retribution and harassment even when not in a public setting. Verified Compl. ¶ 38. Despite YAF's strong desire to guard the First Amendment freedom to associate privately on behalf of itself and its members, YAF is required to disclose much of its donor information to the IRS on Form 990 Schedule B.

## II. THE LEGAL FRAMEWORK OF DONOR DISCLOSURE TO THE IRS

The administration and regulation of nonprofit organizations such as YAF is governed by the Internal Revenue Code. Specifically, IRC § 501(c) provides for various organizations that are exempt from most taxation under 26 U.S.C.§ 501(a). Section 501(c)(3) governs YAF as a nonprofit corporation founded to educate and inspire young people nationwide with conservative ideas. Verified Compl. ¶ 10. YAF is a § 501(c)(3) organization that meets the public support test of 26 U.S.C. § 170(b). Verified Compl. ¶ 11. Under 26 U.S.C. § 6033, the Secretary of the Treasury, by and through the IRS, must collect certain information from § 501(c)(3) nonprofit organizations. This includes "the total of the contributions and gifts received by it during the year, and the names and addresses of all substantial contributors[.]" 26 U.S.C. § 6033(b)(5).

Implementing this statutory requirement, the IRS mandates that nonprofit organizations like YAF file Form 990. *See* 26 C.F.R. § 1.6033-2(a)(1) ("[E]very organization exempt from

taxation under section 501(a) shall file an annual information return specifically setting forth its items of gross income, gross receipts and disbursements, and such other information as may be prescribed in the instructions"); 26 C.F.R. § 1.6033-2(a)(2)(i) ("Except as otherwise provided in this paragraph and paragraph (g) of this section, every organization exempt from taxation under section 501(a), and required to file a return under section 6033 and this section…shall file its annual return on Form 990."). Form 990 discloses a variety of organizational information and financial information. 26 C.F.R. § 1.6033-2(a)(2)(ii) (listing everything from the names and addresses of officers, directors, or trustees to audited financial statements to compensation for key personnel); IRS "Returns of Organization Exempt from Income Tax." IRS, About Form 990, Return of Organization Exempt from Income Tax, https://www.irs.gov/pub/irs-pdf/f990.pdf (detailing various schedules for further disclosures). Form 990 Schedule B is the "Schedule of Contributors" that is mandated by 26 U.S.C. § 6033(b) and regulated by 26 C.F.R. § 1.6033-2(a)(2)(ii)(F) (mandating the disclosure of "[t]he total of the contributions, gifts, grants, and similar amounts received by it during the taxable year, and, in the case of an organization described in section 501(c)(3), the names and addresses of all persons that contributed, bequeathed, or devised $5,000 or more (in money or other property) during the taxable year."); IRS, "Schedule B (Form 990, 990-EZ, 990-PF), Schedule of Contributors," https://www.irs.gov/pub/irs-pdf/f990ezb.pdf.

For a public charity, which is "[a]n organization described in section 501(c)(3) which meets the 33 ⅓ percent-of-support test of the regulations under section 170(b)(1)(A)(vi)," the IRS requires "the name and address of a person who contributed, bequeathed, or devised $5,000 or more during the year only if his amount is in excess of 2 percent of the total contributions, bequests and devises received by the organization during the year." 26 C.F.R. § 1.6033-2(a)(2)(iii)(A). The "$5,000 or 2%" rule calculations are based on the aggregated gifts of any one person in a tax year.

*See* 26 C.F.R. § 1.6033-2(a)(2)(iii)(C). A "substantial contributor" is defined by cross-reference to 26 U.S.C. § 507(d)(2), which defines the term also for private foundations. 26 C.F.R. § 1.6033-2(a)(2)(ii)(F) (requiring disclosure of "the names and addresses of all persons who became substantial contributors (as defined in section 507(d)(2)) during the taxable year"). Under 26 U.S.C. § 507(d)(2)(A), a "substantial contributor" "means any person who contributed or bequeathed an aggregate amount of more than $5,000 to the private foundation, if such amount is more than 2 percent of the total contributions and bequests received by the foundation before the close of the taxable year of the foundation in which the contribution or bequest is received by the foundation from such person."

Disclosure of the nonprofit's donor list is not optional. The IRS may seek civil penalties for failing to include complete and correct information on a nonprofit organization's Form 990, including the donor list on Schedule B. *See, e.g.*, 26 U.S.C. § 6652(c)(1). Currently, those penalties are $66,500 to the organization. *See* 26 U.S.C. § 6652(c)(1)(A) (setting initial penalties); 26 U.S.C. § 6652(c)(7) (providing for adjustment for inflation); IRS, Rev. Proc. 2025-32, 2025-45 I.R.B. 695 (2025) (table of current penalties). Managers of a nonprofit organization are also liable, up to $6,500 from them personally. See 26 U.S.C. § 6652(c)(1)(B)(ii) (setting initial penalties); 26 U.S.C. § 6652(c)(7) (providing for adjustment for inflation); IRS, Rev. Proc. 2025-32, 2025-45 I.R.B. 695 (2025) (table of current penalties).

## III. THE DISCLOSURE OF YOUNG AMERICA'S FOUNDATION'S INFORMATION

This information is supposed to be kept confidential. But the IRS has failed to do so. The information contained on Form 990 Schedule B is of significant interest to unscrupulous actors hoping to pry into the private associations and donations of political opponents. While Form 990 is public, its Schedule B is not. *See* 26 U.S.C. § 6104(d)(3)(A). Other branches of the government

recognize that the IRS struggles to keep this data secure. *See*, *e.g.*, U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-21-178T, INFORMATION TECHNOLOGY: IRS NEEDS TO ADDRESS OPERATIONAL CHALLENGES AND OPPORTUNITIES TO IMPROVE MANAGEMENT, at 6–7 (Oct. 7, 2020), https://www.gao.gov/assets/gao-21-178t.pdf. And the inspector general of the IRS recognizes the same. *See*, *e.g.*, TREAS. INSP. GEN. FOR TAX ADMIN., MAJOR MANAGEMENT CHALLENGES FACING THE IRS IN FISCAL YEAR 2027 at 5–6 (Oct. 2026) (detailing more work for the IRS to do to control data access). The data breaches are the subject of foreign influence and espionage. *See*, *e.g.*, Raphael Satter and A.J. Vicens, "US Treasury says Chinese hackers stole documents in 'major incident,'" REUTERS (December 31, 2024), https://www.reuters.com/technology/cybersecurity/us-treasurys-workstations-hacked-cyberattack-by-china-afp-reports-2024-12-30/.

This all came to a head when Charles Littlejohn, an IRS contractor, accessed and stole tax returns and return information of the President of the United States and information from conservative entities and individuals over a two-year period from 2019 to 2020. Verified Compl. ¶¶ 30–31. Littlejohn admitted that his actions were ideologically motivated. Verified Compl. ¶ 31. Littlejohn, though he accessed and disclosed 78,761 tax returns and nonprofit donor data comprising information from 406,000 taxpayers, was sentenced based on *only a single count* of disclosing information without authorization. *See* TREAS. INSP. GEN. FOR TAX ADMIN., Rep. No. 2025-IE-R019, THOUSANDS OF NOTIFICATIONS TO TAXPAYERS AFFECTED BY THE LARGE-SCALE DATA BREACH WERE RETURNED UNDELIVERABLE at 2 (May 27, 2025), https://www.tigta.gov/sites/default/files/reports/2025-08/2025ier019fr.pdf ("TIGTA's OI identified and shared information with the IRS on 8,418 individual and 70,343 business taxpayers affected by the large-scale data breach."); Anna Scott Farrell, "Gov't Shrugs Off Sentencing Errors, IRS Leaker Tells DC Circ." LAW360 TAX AUTHORITY (Aug. 21, 2025),

https://www.law360.com/tax-authority/federal/articles/2379593?nl_pk=c1fa2079-8a1c-42cd-95f6-f00c84c1eff4 ("Littlejohn pled guilty in October 2023 to one count of unauthorized disclosure of tax return information, which Republicans called a 'sweetheart deal.' He admitted to downloading thousands of returns while on the job with the Internal Revenue Service through his employer, Booz Allen Hamilton."). The judge overseeing the Littlejohn trial "questioned why Littlejohn faced a single felony count of unauthorized disclosure of tax returns and return information." NPR, "Ex-IRS contractor sentenced to 5 years in prison for leaking Trump's tax returns," (Jan. 30, 2024), https://www.npr.org/2024/01/30/1227826718/ex-irs-contractor-sentenced-to-5-years-in-prison-for-leaking-trumps-tax-records. Such light charging limited the ability of the court to sentence Littlejohn commensurate with a greater number of charges that could have been properly alleged. The district court therefore imposed the maximum penalty for the single charged count, calling the breach an "intolerable attack on our constitutional democracy." Ali Sullivan, "IRS Worker Gets 5 Years For Airing Tax Info On Trump, Others" LAW360 TAX AUTHORITY (Jan. 29, 2024), https://www.law360.com/tax-authority/articles/1791078/irs-worker-gets-5-years-for-airing-tax-info-on-trump-others.

The Littlejohn scandal hit YAF's private tax information, Verified Compliant ¶¶ 30–34. The IRS did not notify YAF that its data had been leaked until December 2024. Verified Compl. ¶ 32; *see* Verified Compl. Exhibit A. After almost a year of inquiry on what was disclosed, the IRS sent a second letter listing some of the disclosures. Verified Compl. Exhibit B. On information and belief, YAF believes that more of its private information was taken by Littlejohn and leaked to third parties, including donor information. Verified Compl. ¶ 34.

Many of YAF's donors prefer to remain anonymous. Verified Compl. ¶ 38. For example, supporters sometimes call the office and ask to be removed from YAF's mailing list because they

do not want to be "outed" as receiving mail from YAF. *See id*. By requiring YAF to disclose its donors and then allowing that donor information to leak, the government has burdened YAF's First Amendment right to associate privately with its members and donors.

Because of this, on July 13, 2026, YAF brought this suit to enjoin the government from collecting the names and addresses of its contributors under 26 U.S.C. § 6033(b)(5) and related Treasury Regulations. Verified Compl. ¶ 51. YAF sought facial and as-applied relief from the donor disclosure demands of Form 990 Schedule B. Verified Compl. Prayers for Relief A, B, and C. YAF further sought nominal damages, attorneys fees, and any other relief this Court may grant. Verified Compl. Prayers for Relief D, E, and F. Service was completed July 16, 2026. Defendants sought, and Plaintiff consented to, a 30 day extension for an Answer. Defendants filed their motion to dismiss on October 14, 2026. Defendants' Motion to Dismiss (Dkt. No. 18); Defendants' Br. (Dkt. No. 18-2). YAF now responds, opposing the motion to dismiss.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient allegations to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts "'must accept as true all material allegations of the complaint, drawing all reasonable inferences from those allegations in plaintiff[']s[] favor.'" *De Csepel v. Republic of Hungary*, 714 F.3d 591, 597 (D.C. Cir. 2013) (internal citation and quotation marks omitted). In this way, "[b]y design, this system of pleading makes it relatively easy for plaintiffs" to survive a motion to dismiss. *Berk v. Choy*, 607 U.S. 187, 194 (2026).

## SUMMARY OF THE ARGUMENT

There is no kindly government request for donor information. The Supreme Court, therefore, has long required donor lists demands to survive the First Amendment's exacting scrutiny, a heightened form of judicial review. The Internal Revenue Service ("IRS") requires the

list of all substantial donors to thousands of nonprofit organizations on Form 990 Schedule B. This dragnet data collection subjects information on individual associations and political, religious, and cultural beliefs to government disclosure—all for little gain by the government.

But the government argues that this program must only survive rational basis review. It argues the disclosure program does not focus on disclosure but merely a requirement for qualifying for what it calls a "double subsidy." The government's argument was patently rejected in *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595 (2021) and the Civil Rights era cases, which were reaffirmed in the motion to dismiss context just last term in *First Choice Women's Resource Centers, Inc. v. Davenport*, 608 U.S. 174 (2026). The proper form of judicial review is exacting scrutiny any time the government demands a list of members and supporters of a nonprofit organization.

Under exacting scrutiny, the IRS needs to prove that its collection of a nonprofit's donor data is actually used to enforce the relevant tax laws and is narrowly tailored to gather only the information it needs. The IRS cannot meet this high bar, and it is the government that bears the burden to satisfy exacting scrutiny. It therefore becomes imperative to know if (1) the IRS uses Schedule B regularly in its enforcement and how it does so, and (2) if the IRS has a "less intrusive alternative" to collecting every major donor of a § 501(c)(3) organization. Form 990 Schedule B fails both the governmental interest and the tailoring analyses. The IRS neither regularly uses the information on Schedule B and there are many less intrusive alternatives than the universal collection of donor lists from all § 501(c)(3) organizations like YAF.

Nor can the IRS keep this donor data secure. Breach after breach, data hack after data hack, show that the IRS is simply not able to protect the sensitive financial information it warehouses. And when ideological actors gain access to this data and disclose it to news outlets, the government

gives little attention to robust enforcement. For example, Charles Littlejohn exposed the information of high-ranking officials as well as 406,000 others across the country, and the government merely sought a single count of violating the privacy laws. This shocked the judge reviewing the case and should give pause to the idea the government is interested in protecting donor data.

The government invites this Court to set aside *AFPF*, *First Choice*, and all the other cases applying exacting scrutiny to donor disclosure demands and instead apply rational basis. The government reasons that if rational basis applies, then the government automatically wins, suggesting dismissal. This Court should decline the invitation to apply the wrong standard of scrutiny. But even if, *arguendo*, the government is correct that rational basis is the standard, that still does not compel dismissal under Rule 12(b)(6). Government actors have lost on rational basis review, and in any event, what the government proposes here is a classic unconstitutional condition. Furthermore, the federal apparatus of § 501(c)(3) status affects other rights and abilities in state law, affecting rights beyond what a group can do just federally with tax administration.

Contrary to the government's urging otherwise, this case does not concern the use of government-subsidized funds. YAF does not contest the limitations on § 501(c)(3) organizations or seek to engage in activities Congress has declined to subsidize. Rather, YAF challenges § 6033(b)(5)'s reporting requirement of donor disclosure, a condition entirely unrelated to its expenditures. Because this regulation burdens § 501(c)(3) organizations' right of association, it is subject to heightened scrutiny but survives even rational basis review.

## ARGUMENT

### I. DRAGNET DONOR DATA COLLECTION BY THE IRS IS SUBJECT TO THE FIRST AMENDMENT'S EXACTING SCRUTINY.

The Internal Revenue Service ("IRS") demands the lists of thousands of substantial donors from thousands of § 501(c)(3) organizations in a dragnet of data collection on Form 990 Schedule B, but the government argues that this program must only survive rational basis review. *See*, *e.g.*, Defendants' Br. at 11. The government's assertion is incorrect as a matter of repeated Supreme Court precent. In *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595 (2021) ("*AFPF*") and other landmark cases dating back to the Civil Rights era,[1] *any* government demand for membership or donor lists must survive the First Amendment's exacting scrutiny.

*AFPF* is merely five years old, but just five months ago a unanimous Supreme Court affirmed the same. In April of this year, the unanimous Supreme Court decided *First Choice Women's Resource Centers, Inc. v. Davenport*, 608 U.S. 174 (2026), applying *AFPF* at the motion to dismiss stage. There the Court recognized that "[t]he First Amendment guarantees all Americans the rights to speak, worship, publish, assemble, and petition their government freely. Each of these rights, this Court has "'long understood,'" necessarily carries with it "'a corresponding right to associate with others.'" *Id*. at 184 (quoting *AFPF*, 594 U.S. at 606 and *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984)). That is because "associational rights carry special significance for political, social, religious, and other minorities," but "take that freedom away and "dissident expression" stands particularly vulnerable to marginalization or outright "suppression by the majority," leaving all of society poorer for it." *Id*. at 184–85 (quoting *Roberts*, 468 U.S. at 622).

[1] *See*, *e.g.*, *Buckley v. Valeo*, 424 U.S. 1 (1976) (*per curiam*); *NAACP v. Button*, 371 U.S. 415 (1963) ("*Button*"); *Gibson v. Florida Legislative Investigative Comm.*, 372 U.S. 539 (1963); *Talley v. Cal.*, 362 U.S. 60 (1960); *Shelton v. Tucker*, 364 U.S. 479 (1960); *Bates v. City of Little Rock*, 361 U.S. 516 (1960); *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449 (1958) ("*NAACP*").

And donor disclosure demands are such a way to inhibit the freedom of expression. The *First Choice* Court therefore "acknowledged, too, that demands for private donor information "inevitabl[y]" carry with them a "deterrent effect on the exercise of First Amendment rights." *Id.* at 186. (quoting *Buckley*, 424 U.S. at 65 and collecting cases in string cite).

That is why the First Amendment's exacting scrutiny "requires that there be a substantial relation between the disclosure requirement and a sufficiently important governmental interest" and that "the disclosure requirement be narrowly tailored to the interest it promotes." *AFPF*, 594 U.S. at 611 (citations omitted). Under the First Amendment, all Americans have the right "to pursue their lawful private interests privately and to associate freely with others in so doing[.]" *NAACP*, 357 U.S. at 466. This "basic constitutional protection[]," *Kusper v. Pontikes*, 414 U.S. 51, 57 (1973), "'lies at the foundation of a free society.'" *Buckley*, 424 U.S. at 25 (quoting *Shelton*, 364 U.S. at 486). That is because the First Amendment protects "[t]he strong associational interest in maintaining the privacy of membership lists of groups engaged in the constitutionally protected free trade in ideas and beliefs" which belongs to "all legitimate organizations," *Gibson*, 372 U.S. at 555–56, and "it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious[,] or cultural matters," *NAACP*, 357 U.S. at 460.

While *First Choice* was about laying a claim and at the motion to dismiss stage, *AFPF* remains the greatest case to discuss the metes and bounds of exacting scrutiny as applied to IRS Form 990 Schedule B. In *AFPF*, the Court was tasked with a California law that conditioned the ability of a nonprofit to fundraise upon supplying Form 990 Schedule B. *AFPF*, 594 U.S. at 624–25. The Supreme Court held that the California's demand that nonprofits hand over Schedule B to the state was facially unconstitutional because it "'creates an unnecessary risk of chilling" in violation of the First Amendment… indiscriminately sweeping up the information of *every* major

donor with reason to remain anonymous.'" *Id*. at 616–17 (quoting *Secretary of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 968 (1984)) (emphasis in *AFPF*). In doing so, the *AFPF* Court rejected the idea that a state needs universal disclosure of every nonprofit's substantial donor list, every single year. *See id*. at 617.

California had argued a variety of justifications for the donor list demand, including administrative convenience for enforcing its charities rules, a lack of disclosure to the general public (though the information was available inadvertently), and as a way of detecting fraud. *See id*. 614–15. The Court rejected all these contentions under exacting scrutiny, finding the demand for Schedule B "cannot be justified on the ground that the regime is narrowly tailored to investigating charitable wrongdoing, or that the State's interest in administrative convenience is sufficiently important." *Id*. at 618. The *AFPF* Court therefore held "that the up-front collection of Schedule B is facially unconstitutional, because it fails exacting scrutiny in a substantial number of its applications judged in relation to its plainly legitimate sweep." *Id*. (cleaned up, internal citation removed).

Rational basis review is simply not a part of the analysis for donor list demands. The *AFPF* Court featured six justices that agreed, at a minimum, disclosure laws must meet exacting scrutiny. *See id*. at 607–08 (Roberts, C.J., plurality opinion).[2] Justice Thomas wrote separately that in his view strict scrutiny applies. *Id*. at 619–20 (Thomas, J., concurring in part and concurring in the judgment). Justices Alito and Gorsuch wrote separately that, since the donor disclosure demands failed exacting scrutiny, the Court need not reach the strict scrutiny question. *Id*. at 622–23 (Alito,

[2] Under the *Marks* rule, "a fragmented Court" that "decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977). Here, "exacting scrutiny" as the standard to apply under *AFPF* following the *Marks* rule, because strict scrutiny would be broader.

J., concurring in part and concurring in the judgment). The remaining justices did not argue for rational basis review, but merely that they viewed that exacting scrutiny was satisfied. *See id*. at 630–31 (Sotomayor, J., dissenting) (applying exacting scrutiny framework).

The Defendants' Brief at 16 and 23 points to a one-off "see" citation in *AFPF*, 594 U.S. at 618, to *Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 545 (1983) ("*Regan*"), for the proposition that the IRS donor list demand should be treated differently than a state's list demand. But that single line contrasted two cases, *Regan*, which allowed limited speech restrictions on nonprofits, with *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 633 (1980), which found such a 75% limitation on speech restriction unconstitutional. But those were speech restrictions, not burdens on the freedom to associate, the Court only cited *Regan* the one time and *Schaumburg* twice. A better reading of this is that the *AFPF* Court, in see citing both cases, gives examples where one restriction proved constitutional versus one that did not. But note that in both instances, the government needed to prove that it survived heightened scrutiny. If the IRS wishes to rely on *Regan* it needs to show Schedule B is in support of revenue collection efforts and conferral of tax-exempt status." *AFPF*, 594 U.S. at 618, which, as discussed *supra*, it cannot do.[3]

In response, the government asserts that this case is not about the freedom of association, but instead merely financial reporting in connection to what they call a "double subsidy." *See*, *e.g.*, Defendants' Br. at 6; *id*. at 14. The government argues that YAF is simply opting in to a regulatory

[3] The IRS faces similar questions in courts of the Sixth Circuit. *See Buckeye Inst. v. IRS*, No. 2:22-CV-4297, 2023 WL 7412043 (S.D. Ohio Nov. 9, 2023) (unpublished) (denying summary judgment, concluding that there was an issue of fact as to whether this reporting requirement survived review under exacting scrutiny), *on appeal* No. 25-3170 (6th Cir.) (decision pending).

regime. *Id*. at 11. If the IRS is right that the rule does not compel disclosure, merely an opt-in, then exacting scrutiny would never apply.

The government's argument was patently rejected in *AFPF* and the Civil Rights era cases. Each of these cases on donor privacy were generated by generally applicable business statutes that could be banally described as mere routine disclosure of financial records. *NAACP* centered on the state's use of foreign corporation registration statutes as a means of getting the civil rights group's donor list. *NAACP*, 357 U.S. at 451. *Bates*, 361 U.S. at 517, examined the city's use of business license tax registration. *Shelton*, 364 U.S. at 481, dealt with employment paperwork to be employed as public schoolteacher. *AFPF*, 594 U.S. at 600, centered on what should be routine charities registration with the Attorney General of California. But financial records are deeply personal and "financial transactions can reveal much about a person's activities, associations, and beliefs." *Buckley*, 424 U.S. at 66 (cleaned up, citation omitted).

Privacy of financial records helps enable these constitutional rights. That is because the Freedom of Association must be protected "not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference," such as registration and disclosure requirements and the attendant sanctions for failing to disclose. *Bates*, 361 U.S. at 523 (collecting cases); *see also Button*, 371 U.S. at 433 (noting that the freedoms of speech and association are "delicate and vulnerable" to "[t]he threat of sanctions [which] may deter their exercise almost as potently as the actual application of sanctions"). That is why the *AFPF* Court reaffirmed that "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association," and there is a "vital relationship between freedom to associate and privacy in one's associations" via financial support. *AFPF*, 594 U.S. at 606 (citations omitted, brackets in *AFPF*). Applying *AFPF*, the *First Choice* Court held that "[d]emands for

private donor information "chill" protected First Amendment associational rights even when those demands contemplate disclosure only to government officials and not "'the general public.'" *First Choice*, 608 U.S. at 187 (quoting *AFPF*, 594 U.S. at 616.). Consequently, the Supreme Court has long protected the right not only to associate, but to do so privately free from government surveillance or interference—as articulated in *AFPF* and reaffirmed and recognized just last Term.

A government request for donor information is always burdensome. The Supreme Court, therefore, has long required donor lists demands to survive the First Amendment's exacting scrutiny. Under that test, the IRS needs to prove that its collection of a nonprofit's donor data is actually used to enforce the relevant tax laws and is narrowly tailored to gather only the information it needs. Demanding donor lists should not be taken lightly, and that is why the government must prove its demands survive exacting scrutiny.

## II. THE DRAGNET DONOR LIST DEMANDS OF THE IRS CANNOT SURVIVE EXACTING SCRUTINTY.

Exacting scrutiny "requires that there be a substantial relation between the disclosure requirement and a sufficiently important governmental interest" and that "the disclosure requirement be narrowly tailored to the interest it promotes." *AFPF*, 594 U.S. at 611 (citations omitted). The government bears the burden to satisfy exacting scrutiny. *See id*. It therefore becomes imperative to know (1) how the IRS uses Schedule B regularly in its enforcement, and (2) if the IRS has a "less intrusive alternative" to collecting every major donor of every § 501(c)(3) organization. Form 990 Schedule B fails both the governmental interest and the tailoring analyses.

### A. The Regular and Universal Collection of Donor Data on Schedule B is Not Necessary to Enforce the Tax Laws.

Contrary to the government's assertions, collection of Schedule B cannot be justified as giving information needed to administration of the nation's tax laws. *See*, *e.g.*, Defendants' Br. at 22 (incorporating by reference *id*. at 18-21). In *AFPF*, 594 U.S. at 613, the Supreme Court held

that "even if the State relied on up-front collection in some cases, its showing falls far short of satisfying the means-end fit that exacting scrutiny requires." That is because the government "is not free to enforce *any* disclosure regime that furthers its interests. It must instead demonstrate its need for universal production in light of any less intrusive alternatives." *Id*. (emphasis in original).

The Supreme Court has rejected "mere conjecture as adequate to carry a First Amendment burden." *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 307 (2022) (quoting *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 210 (2014)). Instead, the government must prove the strength of its interest. *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 475 (1995) ("[W]hen the Government defends a regulation on speech as a means to… prevent anticipated harms, it must do more than simply posit the existence of a disease sought to be cured. It must demonstrate that the recited harms are real, not merely conjectural") (citation and punctuation omitted).

The government claims this data collection is for information it can use, *see*, *e.g.*, Defendants Brief at 22, but mere useful financial data does not alone survive exacting scrutiny. A similar argument was rejected in *AFPF*: while recognizing that there may be "an important interest in preventing wrongdoing by charitable organizations," nonetheless "[t]here is a dramatic mismatch, however, between the interest that the Attorney General seeks to promote and the disclosure regime that he has implemented in service of that end." *AFPF*, 594 U.S. at 612. The Supreme Court held that "even if the State relied on up-front collection in some cases, its showing falls far short of satisfying the means-end fit that exacting scrutiny requires." *Id*. at 613. That is because the government "is not free to enforce *any* disclosure regime that furthers its interests. It must instead demonstrate its need for universal production in light of any less intrusive alternatives." *Id*. (emphasis in original). Collecting tens of thousands of Schedule B lists in the aid of hoping to find "information it can use" is not sufficient under exacting scrutiny.

**1. All Publicly Available Information Suggest that the IRS is Not Using the Donor Data it Collects.**

The government cannot show "a substantial relation between the disclosure requirement and a sufficiently important governmental interest," *AFPF*, 594 U.S. at 607 (citation and quotation marks omitted), when it does not even use the information it demands. The IRS admitted—in Notice and Comment rulemaking—that it can ascertain what information it needs on a case-by-case basis. Beyond that, the IRS's own Data Book—for the last three tax years—indicates lack of real audit enforcement via information gleaned from Form 990 Schedule B.[4]

The Supreme Court held in *AFPF* that "pertinent facts in these cases are the same across the board: Schedule Bs are not used to initiate investigations." *Id*. at 618. Not using the information at all calls into question that it is a "sufficiently important governmental interest" in collecting the donor lists. The *AFPF* Court specifically rejected a governmental "interest in amassing sensitive information for its own convenience" as "weak." *Id*. That is because the "risk of a chilling effect on association is enough" to cause great First Amendment harm. Here, all available data points to the lack of Schedule B being used to initiate investigations, and the IRS even admitted so in rulemaking.

First, in 2020, the IRS promulgated a rule to exempt most § 501(c) organizations from Schedule B disclosure. *See* IRS, Guidance Under Section 6033 Regarding the Reporting Requirements of Exempt Organizations, 85 FED. REG. 31959 (May 28, 2020); Verified Compl. ¶ 19. Prior to this rulemaking, the IRS imposed the same disclosure requirement by regulation on many other § 501(c) organizations, including social-welfare organizations under 26 U.S.C. § 501(c)(4), social clubs under § 501(c)(7), and fraternal organizations under §§ 501(c)(8) and

[4] These arguments appear in the Verified Complaint ¶¶ 19-21 as "on information and belief." The government did not comment on these arguments, and, in any event, they are to be taken as true at the motion to dismiss stage. *See*, *e.g.*, *De Csepel*, 714 F.3d at 597.

(10). The 2020 regulation's preamble stated that "[f]or the specific purpose of evaluating possible private benefit or inurement or other potential issues relating to qualification for exemption, the IRS can obtain sufficient information from other elements of the Form 990 or Form 990-EZ and can obtain the names and addresses of substantial contributors along with other information, upon examination *as needed*." *Id.* at 31963 (emphasis added). The IRS also recognized that warehousing this information "poses a risk of inadvertent disclosure of information not open to public inspection," and that the "IRS has experienced incidents of inadvertent disclosure" in the past. *Id.*

Second, the IRS does not regularly use Schedule B in its enforcement of § 501(c)(3) organizations. Instead, IRS personnel look at very few Form 990 filings and litigate less than a dozen charitable contribution cases—and even those cases are mostly about real estate, not cash donations to public charities. As noted in the Verified Complaint at paragraphs 20–21, the IRS's own data reporting indicates it is not using Schedule B. Last year, less than 9 percent of Form 990 returns (not counting private foundations) were examined by IRS personnel. *See* IRS, DATA BOOK, 2025 Pub. No. 55-B at 53, table 3-5 (May 2025) https://www.irs.gov/pub/irs-pdf/p55b.pdf (comparing the total returns of tax-exempt organization, employee retirement plan, government entity, tax-exempt bond returns, and related taxable returns examined, 7,914, with total examinations of Forms 990, 990–EZ, and 990–N, 889). And in 2024, less than 10 percent of Form 990 returns (not counting private foundations) were examined by IRS personnel. *See* IRS, DATA BOOK, 2024 Pub. No. 55-B at 53, table 21 (May 2025) https://www.irs.gov/pub/irs-prior/p55b--052025.pdf (comparing the total returns of tax-exempt organization, employee retirement plan, government entity, tax-exempt bond returns, and related taxable returns examined, 7,013, with total examinations of Forms 990, 990–EZ, and 990–N, 666). A similar story is found for 2023. *See*, *e.g.*, Roger Colinvaux, *Associational Rights Versus Nonprofit Transparency: Information*

*Reporting in the Internet Age*, 2025 U. ILL. L. REV. 1353, 1412 n. 227 (2025) (citing IRS, DATA BOOK 2023 Pub. No. 55-B at 53 (Apr. 2024)). Examining public charities' Form 990 Schedule B lists appears to not be much of a priority for the IRS, based on its own data reporting of what its employees investigate.

In its 2024 report to Congress, the Taxpayer Advocate identified just "nine opinions in business cases issued during the reporting period on the deductibility of charitable contributions." NAT'L TAXPAYER ADVOCATE, ANNUAL REPORT TO CONGRESS 2024 at 157 (Dec. 31, 2024) https://www.taxpayeradvocate.irs.gov/wp-content/uploads/2024/12/ARC24_FullReport.pdf. And of these, most cases "arose due to the increased IRS focus on curtailing abuse in the syndicated conservation easement arena" regarding the value of land donations for environmental purposes, *id.*, not cash or cash-equivalent donations on Schedule B for public charities like YAF. For 2025, the National Taxpayer Advocate aggregated all charitable contribution issues with conservation easement cases, not applicable to a nonprofit like YAF. *See*, *e.g.*, NAT'L TAXPAYER ADVOCATE, ANNUAL REPORT TO CONGRESS 2025 at 151 (Jan. 28, 2026) https://www.taxpayeradvocate.irs.gov/wp-content/uploads/2026/01/ARC_Publication-2104_2025_Web.pdf (defining its data tracking for charitable contributions to be defined as "Disputes in this issue category typically revolve around the valuation of non-cash donations (especially complex conservation easements) under IRC § 170, related substantiation requirements (contemporaneous written acknowledgments), and related percentage limitations based on AGI."); *id.* at 134 (identifying 12 cases in U.S. Tax Court); *id.* at 138 (identifying 2 cases in the court of appeals). Yet the government collects thousands of Form 990 Schedule B lists detailing the information of thousands of individuals, all to not apparently use any of the information, at least in the enforcement or civil litigation data.

Third, while the government claimed it needs the complete donor list of YAF and other nonprofits to determine the public support test to qualify as "public charities," Defendants' Br. at 19, it had provided no data showing it actually uses the information. Nor can the information gleaned from Schedule B prove what the IRS asserts it uses it for: generalized public support. That is because, as the government itself concedes, Schedule B is not demanded of small groups. Defendants' Br. at 8 n.2. Nor are all donors subject to disclosure. As example, the government claims the harm to YAF is minimal because only donors who give more than 2% are on the list, resulting in a threshold of $765,318 for YAF. *See id*. n.3; *id*. at 23 (arguing harm is minimal with this threshold); *id*. (citing thresholds in 26 U.S.C. §§ 6033(b)(5), 507(d)(2)(A); 26 C.F.R. §§ 1.6033-2(a)(2)(ii)(F) and -2(a)(2)(iii)(A)). Without conceding the propriety of the calculations as applied to YAF, notice that, by the government's own view, Schedule B gives an incomplete list that cannot readily ascertain whether a very small group or a very large group has the requisite 10% support required by 26 U.S.C. § 170(b)(1)(A)(vi). Indeed, the IRS even gives a 5 year run up for generating the requisite public support. *See*, *e.g.*, IRS, TAX-EXEMPT STATUS FOR YOUR ORGANIZATION, Pub. 557 at 39 (Rev. Jan. 2025) https://www.irs.gov/pub/irs-pdf/p557.pdf ("[A]n organization can reasonably be expected to meet the one-third support test and the not-more-than-one-third support test during its first 5 tax years, the organization will qualify for classification as a public charity under section 509(a)(2) for its first 5 years."). The information is simply not there for the IRS to test, and, absent a particularized suspicion that an organization does not and did not meet the test, the wholesale collection of Schedule B is simply not tailored.

With no record of actual enforcement or litigation, and a purported use that literally cannot be answered by most nonprofits (and certainly not as applied to YAF), the government's purported interests in demanding yearly submission of Schedule B are not "sufficiently important," *AFPF*,

594 U.S. at 607, and are therefore "mere conjecture," *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 392 (2000) that it might be used to enforce the charities laws.

**2. The Remaining Asserted Interests are not "Sufficiently Important."**

The government's remaining asserted interests in yearly donor disclosure do not satisfy exacting scrutiny's demand that it show "a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *AFPF*, 594 U.S. at 607 (citation and quotation marks omitted). Instead, the government offers speculation that Schedule B "help[s] ensure compliance with Congressional requirements for § 501(c)(3) organizations," looking only to the structure of the tax code on what the information *could* be used for by the government. *See*, *e.g.*, Defendants' Br. at 22 (single paragraph incorporating by reference the asserted government interests outlined in rational basis review from *id*. at 18–21). Of course, the Supreme Court has rejected "'mere conjecture as adequate to carry a First Amendment burden.'" *Cruz*, 596 U.S. at 307. The rest of the government's asserted interests are such "mere conjecture."

The government asserts that Schedule B may be used to "confirm that that those who are claiming large charitable-contribution deductions on their income tax returns actually made the claimed contributions." Defendants' Br. at 18–19. But there is another mechanism for doing so without burdening a nonprofit's donors. For the individual claiming a deduction, the government auditor does not check Schedule B from the organization, but instead demands the individual donor provide a receipt from the nonprofit organization. Known as a "contemporaneous written acknowledgment," such a receipt must detail the amount of the donation, date of the donation, and other pertinent information. *See*, *e.g.*, IRS, CHARITABLE CONTRIBUTIONS: SUBSTANTIATION AND DISCLOSURE REQUIREMENTS 3 Pub. 1771 (Rev. 11-2023) *available at* https://www.irs.gov/pub/irs-pdf/p1771.pdf. This is required for donations of $250 or more, *see id*., which is far more granular than Schedule B will ever be able to provide. The IRS will accept some other contemporaneous

record of the transaction (e.g., bank records, cancelled checks, ledgers), if it is supplied by the individual. This is the standard "show us receipts" aspect of any audit or investigation. And yet it is also less burdensome because it is an individualized investigation of a single taxpayer, rather than the whole donor list of an organization.

The Defendants also suggest that collection of donor data on Schedule B is important to assure voluntary compliance with the nation's tax laws: in the government's own words, a "deterrent effect." Defendants' Br. at 5. But that tendency of government mandated disclosure to deter even lawful behavior is precisely the "more subtle governmental interference" of associational rights found to be violative of the First Amendment in the Civil Rights era cases. *See*, *e.g.*, *Bates*, 361 U.S. at 523 (collecting cases). The specter of tax enforcement, combined with tax law's complexity, garners a visceral reaction in law-abiding citizens, including those that lead nonprofit groups. That everyone is afraid of the tax agent knocking at the door is even *more* reason to be cautious of compelled disclosure.

### B. The IRS Donor List Demands Fail Exacting Scrutiny's Tailoring Analysis.

The Supreme Court has repeatedly held that "First Amendment freedoms need breathing space to survive." *Button*, 371 U.S. at 433.[5] Thus, to "pass First Amendment scrutiny," the government must show the regulation is "tailored" to the government's "stated interests" for that regulation of core First Amendment activity. *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 168 (2002). Exacting scrutiny is "not a loose form of judicial review." *Wis. Right to Life, Inc. v. Barland*, 751 F.3d 804, 840 (7th Cir. 2014). It is instead a "strict test," *Buckley*, 424 U.S. at 66, requiring an analysis of the burdens imposed, and whether those burdens

[5] *Cf. Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 468–469 (2007) ("*WRTL II*") (Roberts, C.J., controlling op.) (quoting same); In re *Primus*, 436 U.S. 412, 432–33 (1978) (quoting same); *Gooding v. Wilson*, 405 U.S. 518, 522 (1972) (quoting same); *Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*, 385 U.S. 589, 604 (1967) (quoting same).

advance the government's stated interest because, "[i]n the First Amendment context, fit matters." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 218 (2014) (Roberts, C.J., controlling opinion). The point of exacting scrutiny's tailoring is to give such "breathing space."

But the government has many other options than simply requiring the nonprofit world submit its lists of substantial contributors every year. Here is but one example, based upon the government's primary justification for demanding Schedule B, which it claims is to police "excess benefit transactions" by a nonprofit's managers and "disqualified persons" who receive a benefit from certain tax-exempt organizations. Defendants' Br. at 20; *id*. at 22 (arguing same). In other words, the government claims it needs the data to protect against private inurement—donors shielding their self-dealing with the charities they support—and attendant tax penalties for those who violate the rules. To do so, the government wants all the donors listed on Schedule B.

But Schedule B is not the best means for detecting private inurement: Schedule L is designed *precisely* for the purpose the government asserts. In fact, the IRS alluded to this when it exempted other § 501(c) organizations from filing Schedule B. In its 2020 rulemaking, the IRS noted, "For the specific purpose of evaluating possible private benefit or inurement or other potential issues relating to qualification for exemption, the IRS can obtain sufficient information from other elements of the Form 990 or Form 990–EZ." 85 FED. REG. at 31963. Schedule L is what the IRS needs, not Schedule B. And, even then, if the IRS suspects violation of the private inurement bans, then it "can obtain the names and addresses of substantial contributors, along with other information, upon examination, as needed." *Id*. In this way the IRS already recognizes that Schedule B is not helpful, but Schedule L (which is not challenged by YAF) is the correct schedule, and there is always opportunity for particularized law enforcement inquiry outside a universal demand of donor lists from every nonprofit.

That is because, while Schedule B is a long list of an organization's supporters, Schedule L, in contrast, focuses on "financial transactions or arrangements between the organization and a disqualified person(s) under section 4958 or other interested persons." IRS, "Instructions for Schedule L (Form 990) (12/2024)," https://www.irs.gov/instructions/i990sl. Schedule L lists any benefit given to a "current or former officer, director, trustee, or key employee." *Id*. The lookback is the up to the prior five years. *See id*. (emphasis removed). Schedule L also requires disclosure of benefits to "substantial contributors"—the very same as those listed in Schedule B—if they have a reportable transaction. *Id*. (emphasis removed). And the family and employees of a substantial contributor must also be disclosed if they receive a benefit from the nonprofit. *See id*. (requiring the listing "[a] family member of any individual described above" and "an employee (or child of an employee) of a substantial contributor") (emphasis removed).

If the government wants to stop private inurement, it will find it by looking at Schedule L, not Schedule B. Schedule L will list each transaction between the regulated person (*i.e.*, director, officer, substantial contributor, *etc.*) and the charity's actions. *See id*. ("Part I. Excess Benefit Transactions"). Schedule L will show possible improper loans to and from interested persons. *See id*. ("Part II. Loans to and/or From Interested Persons"). Schedule L will show other grants or assistance given to regulated persons, including substantial contributors. *See id*. ("Part III. Grants or Assistance Benefiting Interested Persons"). And Schedule L lists business transactions that involve the interested persons. *See id*. ("Part IV. Business Transactions Involving Interested Persons").

The government claims it needs a "snapshot" of the donors list in Schedule B to prevent private inurement. Defendants' Br. at 19. It does not show how that snapshot is used, *see id*., and one is left to assume the government's claim is that it merely makes it easier to enforce the private

inurement laws. The Supreme Court has held that such government interests must be "sufficiently important," not merely nice to have. *AFPF*, 594 U.S. at 618 (rejecting "administrative convenience" as a weighty enough interest).

It is Schedule L that shows the relationship between the charity and someone with significant control over the charity. The IRS does not need donor information to enforce tax law concerning self-dealing, excess benefit transactions, transactions with interested persons, and the like. Schedule L already serves these interests by providing a highly detailed view of potential conflicts of interest, payments to officers and directors, organizational finances, and the like. Schedule L is not being challenged by YAF. Schedule B, in contrast, is simply a list of supporters that is warehoused on government computers—and ripe for misuse and hacking, ideological leaks, and similar dangers to associational freedoms.

### C. The IRS Cannot Keep the Donor Data Secure and the Government is not Vigilant in Correcting Data Breaches.

A key consideration in the articulation of exacting scrutiny in *AFPF* was that case's trial testimony of California failing to keep donor data private and secure. *See AFPF*, 594 U.S. at 604–05 (discussing the lack of data control and availability of information on a public website). Indeed, California failed to secure donor information when "nearly 2,000 confidential Schedule Bs that had been inadvertently posted to the Attorney General's website, including dozens that were found the day before trial." *Id*. at 604. One "expert witnesses discovered that he was able to access hundreds of thousands of confidential documents on the website simply by changing a digit in the URL." *Id*. at 604–05. Failure to secure the data intensifies the First Amendment harm. *See*, *e.g.*, *id*. at 617 ("Such risks are heightened in the 21st century and seem to grow with each passing year, as "anyone with access to a computer can compile a wealth of information about anyone else,

including such sensitive details as a person's home address or the school attended by his children.") (cleaned up, citation omitted).

As detailed in the Verified Complaint ¶¶ 30–34, Charles Littlejohn, an IRS contractor, accessed and stole tax returns and return information of YAF, among the thousands of documents disclosed by Littlejohn. Verified Compl. ¶¶ 32–33. The IRS sent YAF a letter saying so. *See* Verified Compl. Exhibit A. After almost a year of inquiry on what was disclosed, the IRS sent a second letter listing some of the disclosures. Verified Compl. Exhibit B. On information and belief, YAF believes that more of its private information was taken by Littlejohn and leaked to third parties, including donor information. TREAS. INSP. GEN. FOR TAX ADMIN., No. 2025-IE-R019, THOUSANDS OF NOTIFICATIONS TO TAXPAYERS AFFECTED BY THE LARGE-SCALE DATA BREACH WERE RETURNED UNDELIVERABLE, at 2–3 (May 27, 2025), https://www.tigta.gov/sites/default/files/reports/2025-08/2025ier019fr.pdf (noting "thousands of taxpayers did not receive the initial letters that the IRS mailed" to inform them of their data may be leaked as part of the Littlejohn breach).

Between August and October 2019, Littlejohn disclosed the President's tax return information to *The New York Times*. *See id*. TIGTA's Office of Investigations also reported that, "in July and August 2020, Littlejohn separately stole tax returns and return information associated with thousands of the nation's wealthiest individuals." *Id.* at 1. Then, "in November 2020, Littlejohn disclosed this tax return information to a second news organization," which is ProPublica. *Id*. What is clear, by Littlejohn's own statements, was that this was an ideological task, saying he "acted out of a sincere, if misguided, belief I was serving the public interest." NPR, "Ex-IRS contractor sentenced to 5 years in prison for leaking Trump's tax records," (Jan. 30, 2024),

https://www.npr.org/2024/01/30/1227826718/ex-irs-contractor-sentenced-to-5-years-in-prison-for-leaking-trumps-tax-records.

Littlejohn, though he accessed and disclosed 78,761 tax returns and nonprofit donor data comprising information from 406,000 taxpayers, was sentenced based on *only a single count* of disclosing information without authorization. *See* TIGTA, LARGE-SCALE DATA BREACH at 2 ("TIGTA's OI identified and shared information with the IRS on 8,418 individual and 70,343 business taxpayers affected by the large-scale data breach."); Anna Scott Farrell, "Gov't Shrugs Off Sentencing Errors, IRS Leaker Tells DC Circ." LAW360 TAX AUTHORITY (Aug. 21, 2025) https://www.law360.com/tax-authority/federal/articles/2379593?nl_pk=c1fa2079-8a1c-42cd-95f6-f00c84c1eff4 ("Littlejohn pled guilty in October 2023 to one count of unauthorized disclosure of tax return information, which Republicans called a 'sweetheart deal.' He admitted to downloading thousands of returns while on the job with the Internal Revenue Service through his employer, Booz Allen Hamilton."). The judge overseeing the Littlejohn trial "questioned why Littlejohn faced a single felony count of unauthorized disclosure of tax returns and return information." NPR, "Ex-IRS contractor sentenced to 5 years." Such light charging limited the ability of the court to sentence Littlejohn commensurate with a greater number of charges that could have been properly alleged. The district court therefore imposed the maximum penalty for the single charged count, calling the breach an "intolerable attack on our constitutional democracy." Ali Sullivan, "IRS Worker Gets 5 Years For Airing Tax Info On Trump, Others" LAW360 TAX AUTHORITY (Jan. 29, 2024) https://www.law360.com/tax-authority/articles/1791078/irs-worker-gets-5-years-for-airing-tax-info-on-trump-others.

The Littlejohn scandal hit YAF's private tax information, Verified Compliant ¶¶ 30–34, but the leaks have national security implications. In 2015, the IRS failed to protect 100,000

taxpayer returns that were subject to an attack of its security by Russia. *See*, *e.g.*, Chris Frates, "IRS believes massive data theft originated in Russia," CNN (June 4, 2015), https://www.cnn.com/2015/05/27/politics/irs-cyber-breach-russia/index.html. More recently, the U.S. Treasury said that Chinese state-sponsored hackers stole IRS documents and data. *See*, Raphael Satter and A.J. Vicens, "US Treasury says Chinese hackers stole documents in 'major incident,'" REUTERS (December 31, 2024), https://www.reuters.com/technology/cybersecurity/us-treasurys-workstations-hacked-cyberattack-by-china-afp-reports-2024-12-30/. Vast databases of the financial lives of American citizens are an obvious attack point for foreign states.

Other branches of the government recognize that the IRS struggles to keep this donor data secure. *See*, *e.g.*, U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-21-178T, INFORMATION TECHNOLOGY: IRS NEEDS TO ADDRESS OPERATIONAL CHALLENGES AND OPPORTUNITIES TO IMPROVE MANAGEMENT, at 6–7 (Oct. 7, 2020), https://www.gao.gov/assets/gao-21-178t.pdf. In light of the troubles of the IRS to keep data secure, it needs to collect less sensitive information, not more. In September of last year, the GAO faulted the IRS for failing to fully comply with the government's own recommendations to better secure taxpayer data. U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-25-108066, PRIORITY OPEN RECOMMENDATIONS: INTERNAL REVENUE SERVICE, at 2 (Sept. 26, 2025), https://www.gao.gov/products/gao-25-108066. Specifically, the "IRS does not have a complete inventory to ensure it has implemented safeguards to protect taxpayer information being processed or stored on all of its systems, applications, and databases." *Id*. This is after an August 2023 GAO recommendation and past financial audits of the IRS financial statements. *See id*. (citing, *inter alia*, U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-25-107930, IRS FINANCIAL REPORTING: IMPROVEMENTS NEEDED IN INFORMATION SYSTEM AND OTHER CONTROLS (Mar. 18, 2025), https://www.gao.gov/products/gao-25-107930 and U.S. GOV'T ACCOUNTABILITY OFFICE,

GAO-25-107202, FINANCIAL AUDIT: IRS'S FY 2024 AND FY 2023 FINANCIAL STATEMENTS (Nov. 7, 2024), https://www.gao.gov/products/gao-25-107202.

The GAO identified these issues as a "High Risk Area," and told the IRS it "needs to update its databases and sources that inform its inventory to ensure they have complete and accurate information" on what systems store and process sensitive taxpayer information—a recommendation dating back to 2023. GAO, PRIORITY OPEN RECOMMENDATIONS: INTERNAL REVENUE SERVICE at 16. That is because "continuing control deficiencies related to information systems and safeguarding assets increase the risk of unauthorized access to and modification of data and programs, disclosure of sensitive data, and disruption of critical operations." GAO, IRS FINANCIAL REPORTING at 6. Yet just this year a TIGTA recognized that taxpayer data remained "vulnerable to inappropriate and undetected use, modification, or disclosure." TREAS. INSP. GEN. FOR TAX ADMIN., Rep. No. 2026-20-053, THE IRS'S CYBERSECURITY PROGRAM WAS NOT EFFECTIVE FOR FISCAL YEAR 2026, at 2 (Sept. 15, 2026), https://www.tigta.gov/sites/default/files/100/2026200053fr.pdf . This remains a major management challenge for the IRS, as the agency cannot even ascertain what information it shares with other governments. *See*, *e.g.*, TREAS. INSP. GEN. FOR TAX ADMIN., MAJOR MANAGEMENT CHALLENGES FACING THE IRS IN FISCAL YEAR 2027 at 6 (Oct. 2026), https://www.tigta.gov/sites/default/files/100/FY_2027_MMC_FINAL.pdf (noting "the IRS cannot readily identify all data sharing agreements because it lacks a centralized database. Specifically, the IRS office responsible for managing these agreements was unaware of 30 additional [Federal Tax Information]-related agreements established by other IRS business units."). The IRS continues to fail to secure access to taxpayer data by those who have resigned and "more than half of the nearly 1,200 employees and contractors hired between January and

August 2025 did not complete appropriate security awareness training" and "security vulnerabilities in contractor software were not timely resolved." *Id*. Literally, even fences and loading docks "used to receive taxpayer information were open and not properly secured." *Id*. The IRS is not taking data security seriously.

While it is apparent that the government does not regularly use Schedule B to enforce the tax laws, it cannot keep the donor data secure, even with its own employees and contractors.[6] The government's own accounting and oversight watchdogs have repeatedly told the IRS it cannot keep data secure. This has resulted in hundreds of thousands of individual taxpayers and nonprofit tax returns being stolen or leaked to everyone from foreign nations to ideological foes. Worse, the government has shown little incentive to prosecute such large leaks, giving easy deals to Charles Littlejohn to serve only time on only one count of illegal disclosure when hundreds of thousands of returns were disclosed. Just like in *AFPF*, it is clear that the government cannot keep the donor data secure from public dissemination. Schedule B cannot survive exacting scrutiny.

## III. RATIONAL BASIS REVIEW DOES NOT COMPEL DISMISSAL AND SCHEDULE B CANNOT SURVIVE THIS MINIMAL REVIEW ANYWAY.

The government invites this Court to set aside *AFPF*, *First Choice*, and all the other cases applying exacting scrutiny to donor disclosure demands and instead apply rational basis. *See*, *e.g.*, Defendants' Br. at 11–17. The government also reasons that if rational basis applies, then the government automatically wins, suggesting dismissal. *See*, *e.g. id*. at 17-21. This Court should decline the invitation to apply the wrong standard of scrutiny, for all the reasons already discussed. But even if, *arguendo*, the government is correct that rational basis is the standard, that still does

[6] TIGTA reports that a "total of 91,661 users, of which 5,068 were contractors,…were authorized to access one or more of the 276 sensitive systems." TREAS. INSP. GEN. FOR TAX ADMIN., No. 2024-IE-R008, ASSESSMENT OF PROCESSES TO GRANT ACCESS TO SENSITIVE SYSTEMS AND TO SAFEGUARD FEDERAL TAX INFORMATION at 1 (Feb. 6, 2024) *available at*: https://www.atr.org/wp-content/uploads/2024/02/TIGTA-report-2024.pdf.

not compel dismissal under Rule 12(b)(6). Sometimes the government loses rational basis review and, in any event, conditioning government benefits (what the Defendants call a "double subsidy") on unconstitutional conditions still fails this lower standard of review.

First, rational basis is not an automatic win, despite the shorthand often taught in law schools.[7] Even if the applicable standard is rational basis review, the law is not automatically valid. The law must still be rationally related to a legitimate government interest, and courts have invalidated laws failing to meet even that standard. In *U.S. Department of Agriculture v. Moreno*, 413 U.S. 528, 538 (1973), the Supreme Court invalidated an exclusion from the food stamp program for households with a non-relative resident. Expressly applying the rational basis standard, the Court concluded that the restriction was "wholly without any rational basis." *Id.* Similarly, in *City of Cleburne, Tex. v. Cleburne Living Center.*, 473 U.S. 432, 446 (1985), although the Court rejected the lower court's application of heightened scrutiny to a zoning regulation, it ultimately invalidated the regulation simply applying rational basis review. Likewise, the Fifth Circuit has invalidated laws even under the deferential rational basis review given to economic regulations. *St. Joseph Abbey v. Castille*, 712 F.3d 215, 227 (5th Cir. 2013). And in *Minnesota Voters Alliance v. Mansky*, 585 U.S. 1, 23 (2018), the Supreme Court invalidated Minnesota's viewpoint neutral apparel regulations although they were subject to the deferential standard of review for nonpublic forums, which only requires that a law be "reasonable" when restricting political speech at a polling place. Not even a deferential standard of review can save a nonsensical law that is not proven to be tied to the stated interests.

---

[7] Nor is strict scrutiny an automatic win for a challenger. *See*, *e.g.*, *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 444 (2015) (collecting cases); *id*. ("This is therefore one of the rare cases in which a speech restriction withstands strict scrutiny."). The parties must do the work of showing which standard of review applies, and how the restriction at issue does or does not satisfy the test.

Second, the government argues that rational basis review requires YAF to bear the burden of negating every possible basis for supporting a law. Defendants' Br. at 17–18. But YAF brings a facial First Amendment challenge, which relaxes the burden considerably. While "[n]ormally a plaintiff bringing a facial challenge must establish that no set of circumstances exists under which the law would be valid, or show that the law lacks a plainly legitimate sweep," the Supreme Court has recognized a "a second type of facial challenge." *AFPF*, 594 U.S. at 615 (cleaned up, citations omitted). Under such a First Amendment facial challenge, "a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id*. (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)). That is, the Supreme "Court has lowered that very high bar" for cases such as the one YAF brings. *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). "So in this singular context" of a First Amendment challenge, "even a law with 'a plainly legitimate sweep' may be struck down in its entirety" if the law's unconstitutional applications substantially outweigh its constitutional ones." *Id*. at 723–24. In this instance, the government is burdening a clearly-established First Amendment right, and therefore the pleading standards are relaxed.

Third, the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected...freedom of speech even if he has no entitlement to that benefit." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) (quoting *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.,* 547 U.S. 47, 59 (2006)). This limitation applies not only to speech, but to other protected rights like association. In *Perry v. Sindermann*, 408 U.S. 593, 597 (1972), the Supreme Court cautioned that, "if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited." Recently, the Court reaffirmed the vitality

of the doctrine in the First Amendment context, noting that "[p]ublic education is a public benefit, and the government cannot 'condition' its 'availability' on parents' willingness to accept a burden on their religious exercise." *Mahmoud v. Taylor*, 606 U.S. 522, 561 (2025).

The government is not, of course, prohibited from imposing conditions on government benefits, so long as it is regulating activity and not restricting the right of private association. The Court has reasoned that tax exemptions and deductions function like subsidies and has allowed Congress to impose some conditions on how such funds are spent on activities. *See Regan*, 461 U.S. at 544. In *Regan*, the Court upheld Congress's prohibition on § 501(c)(3) organizations lobbying. *See id.* at 545. The Court reasoned that tax, and that the restriction effectively reflected a congressional choice "not to subsidize lobbying as extensively as it chose to subsidize other activities that non profit organizations undertake to promote the public welfare." *Id*. at 544. Similarly, in *Rust v. Sullivan*, 500 U.S. 173, 198 (1991), the Court upheld a Congressional prohibition on the use of public funds for abortion-related public health activities, reasoning that "[t]he condition that federal funds will be used only to further the purposes of a grant does not violate constitutional rights." Thus, the government may place some conditions on the use of funds by tax-exempt organizations. These cases do not, however, allow the government to impose conditions unrelated to the expenditure of subsidies that burden constitutionally protected rights.

The government's remaining rational basis cases are unpersuasive. The government relies heavily on *Lewis Publishing Co. v. Morgan*, 229 U.S. 288 (1913). Defendants' Br. at 11–12; *id*. at 14; *id*. at 15. As the Defendants must concede "*Lewis Publishing* pre-dated constitutional tiers of scrutiny analysis by decades." *Id.* at 12. Not only that, but the case was brief and argued before the Sixteenth Amendment passed. *See Lewis Publishing Co.*, 229 U.S. at 288 (stating the case was argued Dec. 2 & 3, 1912); *cf*. National Archives, *Milestone Documents: 16th Amendment to the*

*U.S. Constitution: Federal Income Tax (1913)* https://www.archives.gov/milestone-documents/16th-amendment ("[O]n February 25, 1913, with the certification by Secretary of State Philander C. Knox, the 16th amendment took effect.").

*Lewis Publishing* predates the Civil Rights era, *AFPF*, and *First Choice*—the latter two cases by more than a century—and which are on point for the question of donor disclosure. Instead, the minimal and organization-focused disclosures in *Lewis Publishing* are more akin to the Corporate Transparency Act, which was upheld in cases like *National Small Business United v. U.S. Department of the Treasury*, 161 F.4th 1323, 1326 (11th Cir. 2025). *Lewis Publishing* involved a biannual report of "the names and addresses of the editors, publishers, business managers, and owners, stockholders, security creditors, and the daily circulation of such newspapers for the preceding six months." *Lewis Pub.*, 229 U.S. at 298. Likewise, the Corporate Transparency Act requires "requires certain corporate entities to report their "beneficial owners"—*i.e.*, the actual people who exercise control over the entity—to the Department of the Treasury." *Nat'l Small Bus. United*, 161 F.4th at 1326. Nonprofit donors, absent another relationship like sitting on the Board of Directors, are not stockholders and do not control a nonprofit. Again, the distinction between *AFPF*'s donor disclosure protections and *Lewis Publishing* is that the latter is about regulation of activity and disclosure of the *business*, not the *donors and supporters*.

Similarly, the reliance by the government on a dissent is similarly unpersuasive. Defendants' Br. at 16 (citing *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 237 (1987) (Scalia, J., dissenting)). In *Arkansas Writers' Project*, Justice Scalia wrote only for himself and Chief Justice Rehnquist. The other seven jurists on the Court held that there was discriminatory and a content-based approach to taxation of magazines. *See*, *e.g.*, *id.* at 231. But notably, the majority rejected "raising revenue" and other perfunctory justifications for treating different types

of publications differently. *Id*. at 231–322. That is because the Supreme Court "cases clearly establish that a discriminatory tax on the press burdens rights protected by the First Amendment." *Id*. at 227 (collecting cases).

Defendants' reliance on *Mobile Republican Assembly v. United States*, 353 F.3d 1357 (11th Cir. 2003) is misplaced because the case is simply inapposite. There, the plaintiffs sought to challenge tax reporting requirements, but as the case itself noted, as a § 527 the reporting was similar to that under the Federal Election Campaign Act, but again that was focused on the activity of the organization (political speech). *See id*. at 1360. In any event, the case was resolved on jurisdictional grounds, with the Eleventh Circuit holding that the challenge was barred by the Anti Injunction Act and the Declaratory Judgment Act. *Id*. at 1362. And the part of the complaint brought by the contributor, and that attendant disclosure, was not on appeal. *Id*. at 1362–63 ("Even if Haughton might be eligible for the *South Carolina* exception [to the jurisdictional bar]… that portion of [the district court] ruling is not on appeal here.").

The Court reaffirmed this distinction between conditions on the use of funds and other conditions on recipients in *Agency for International Development v. Alliance for Open Society International, Inc.*, 570 U.S. 205, 217 (2013). There, the Court summarized its precedents as distinguishing "between conditions that define the limits of the government spending program—those that specify the activities Congress wants to subsidize—and conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *Id.* at 214–15. The former conditions are an acceptable use of Congress's funding prerogative, while the latter are unconstitutional conditions, such as the requirement at issue in that case that grant recipients adopt certain policy positions. *See id.* at 214.

The government argues that the disclosure requirements fall into the first category because "does not reach beyond the § 501(c)(3) program to control speech." Defendants' Br. at 17. By defining § 501(c)(3) status in its entirety as a "program," the Government seeks to avoid the unconstitutional conditions doctrine despite the burden to YAF's First Amendment Rights. Despite the government's efforts, however, the term "program" as used by the Supreme Court in its unconstitutional conditions cases is not elastic enough to include the § 6033(b)(5) requirement. In each of the cases cited by the government, the Court addressed regulations on the use of funds, not general requirements applicable to recipients.

In *Regan*, the Court did not treat § 501(c)(3) status itself as a discrete program, but rather focused on the limits Congress put on the use of funds by § 501(c)(3) organizations. *See Regan*, 461 U.S. at 544. The Court's reasoning turned on Congress's decision to not to subsidize a certain kind of activity: lobbying. *See id.* Similarly, in *Rust*, the Court explicitly distinguished between "situations in which the Government has placed a condition on the recipient of the subsidy rather than on a particular program or service." *Rust*, 500 U.S. at 197. The prohibition on the use of federal funds for abortion-related services, the Court concluded, clearly fit the latter rather than the former, and was therefore permissible. *See id*. at 198. The challenged condition is this case clearly fits the former as it requires disclosures of contributions rather than limiting expenditures. Similarly, required filtering software in *United States v. American Library Association, Inc*., 539 U.S. 194, 211–12 (2003), ensured that public funds were spent only for authorized purposes. All of these touch on regulating activity, not directly burdening the freedom of association as a precondition to getting a government benefit.

In *Agency for International Development*, the Court was even more explicit that "program" refers to limits on the use of funds: "the relevant distinction that has emerged from our cases is

between conditions that define the limits of the government spending program—*those that specify the activities Congress wants to subsidize*—and conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *Agency for Int'l Dev*, 570 U.S. at 214–15 (emphasis added). The Court held that the definition of the "program" relates to limits on the use of funding, not all requirements applied to the recipients of federal funds or subsidies. The Court even explicitly warned about the move the government makes here: "Congress cannot recast a condition on funding as a mere definition of its program in every case, lest the First Amendment be reduced to a simple semantic exercise." *Id.* at 215 (quoting *Legal Services Corporation v. Velazquez*, 531 U.S. 533, 547 (2001)).

Furthermore, the government's contention that § 501(c)(3) status is a simple "opt-in subsidy" obscures the vital role of that status in regulating charities in state law. For example, many states tie their state income tax deductions or credits to federal taxable income or 26 U.S.C. § 170, thereby limiting deductions to donations to § 501(c)(3)-qualified organizations. *See*, *e.g.*, ARIZ. REV. STAT. §§ 43-1041(I)(2) (deduction) and 43-1088(K)(1) (credit for certain donations); IDAHO CODE § 63-3022(j)(2); IOWA CODE § 422.7; KAN. STAT. § 79-32,120(a)(5); S.C. CODE § 12-6-1130(12); and VA. CODE § 58.1-322.03. Similarly, in many states, exemptions from sales and use taxes depend on § 501(c)(3) status. *See*, *e.g.*, GA. CODE. § 48-8-3 (various sales tax exemptions limited to 501(c)(3) qualified entities); ME. REV. STAT. tit. 36, §§ 1760(115) (sales tax) and 1864 (use tax); UT. CODE ANN. § 59-12-104.1; 32 VT. STAT. § 9743 (sale, service, or admission to a place of entertainment); WIS. STAT. § 77.54(9a)(f). And several states limit their property tax exemption to organizations qualifying for federal § 501(c)(3) status. *See*, *e.g.*, ARIZ. REV. STAT. § 42-11124; MINN. STAT. § 272.02, subd. 7; MONT. CODE § 15-6-201(1)(i). In addition to these major tax categories, numerous other tax advantages are available only to § 501(c)(3)

organizations. *See*, *e.g.*, MD. CODE, TAX–GEN. § 7-203(e) (exemptions from inheritance taxation for property donated to 501(c)(3)).

Innumerable state programs and grants are limited to § 501(c)(3) organizations. A cursory search of any given state's statutes for "26 U.S.C. 501(c)(3)" reveals dozens, if not hundreds, of programs, grants, exemptions, and other benefits that are limited to § 501(c)(3) organizations. A small sample of state-offered benefits available only to § 501(c)(3) entities includes security grants, state employee payroll contribution programs, and access to fundraising tools like charitable gaming. *See*, *e.g.*, FLA. STAT. § 252.3712; FLA. ADMIN. CODE r. 27PER24-1 (security grants); TEX GOV'T CODE § 659.131 (payroll contributions); TENN. CODE § 3-17-102 (exemption for gaming as a fundraising tool). While the Government characterizes an organization's choice between § 501(c)(3) status and § 501(c)(4) status as a simple one controlling only access to federal deductions, Defendants' Br. at 14, § 501(c)(3) status affects many other variables, and an organization's mission may give it no choice but to obtain § 501(c)(3) status in order to operate effectively at the state level.

But, contra the Defendants' Brief, this case does not concern the use of government-subsidized funds. YAF does not contest the limitations on § 501(c)(3) organizations or seek to engage in activities Congress has declined to subsidize. Rather, YAF challenges § 6033(b)(5)'s reporting requirement of donor disclosure, a condition entirely unrelated to its expenditures. This reporting requirement constitutes no part of the "program"—that is, limitations on the purposes for which § 501(c)(3) organizations can spend their funds. Rather, it is an independent and unrelated administrative regulation. Because this regulation burdens § 501(c)(3) organizations' right of association, it is subject to heightened scrutiny, but would not survive even rational basis review.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied and this case continue apace to protect the rights of Young America's Foundation.

## REQUEST FOR ORAL ARGUMENT

Young America's Foundation requests oral argument. This motion involves important issues arising under multiple Supreme Court interpretations of the First Amendment and the interplay between multiple provisions of the Internal Revenue Code. The importance of the issues and complexity of the pertinent case law suggest that oral argument will be helpful to the Court.

Respectfully submitted,

s/ Tyler Martinez

Tyler Martinez (Atty. No. 1022937)
Joseph Henchman (Atty. No. 985625)
NATIONAL TAXPAYERS UNION FOUNDATION
122 C Street N.W., Suite 700
Washington, D.C. 20001
Telephone: (703) 683-5700
tmartinez@ntu.org
jbh@ntu.org

Dated: October 28, 2026

*Counsel for Plaintiff*